UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

JOANNE WOODWARD, ADMINISTRATRIX :
OF THE ESTATE OF ROBERT :
WOODWARD, PAUL WOODWARD, :
JOANNE WOODWARD and :
JILL WOODWARD DEBRADY :
:
    v. :  CIVIL NO. 1:02CV35
:
:
TOWN OF BRATTLEBORO, :
MARSHALL HOLBROOK and :
TERRANCE PARKER :
_____ :



RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
(Papers 86 and 89)

On December 2, 2001, two Brattleboro Police Officers,
Marshall Holbrook and Terrance Parker, mortally shot Robert
Woodward at the All Souls Church in Brattleboro.  The
plaintiffs, administratrix of the Estate of Robert Woodward
and other relatives of the decedent, have brought this case
pursuant to 42 U.S.C. § 1983.  They allege, inter alia, that
Holbrook and Parker violated Mr. Woodward's constitutional
rights by using deadly and unreasonable force.  See, e.g.,
Amended Complaint (Paper 83) at para. 10.  They further allege
the Town of Brattleboro employed an unconstitutional policy
and practice by "improperly and inadequately train[ing] and
instruct[ing] members of its police department" to deal with
an emotionally disturbed person (hereinafter "EDP") like
Woodward.  See Paper 83 at para. 13.

1

In separate motions, the individual defendants and the Town of Brattleboro have moved for summary judgment.  On May 6, 2004, the Court conducted a hearing at which the parties presented further argument relating to these motions.  Upon consideration of the parties' written submissions and oral presentations, and for the reasons set forth below, both Motions for Summary Judgment are GRANTED.

## I. Standard of Review

A court's role when considering a motion for summary judgment is "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." Gibson v. Am. Broad. Co., 892 F.2d 1128, 1132 (2d Cir. 1989). The Court may grant summary judgment only where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Only disputes over material facts which might affect the outcome of the suit under the governing law preclude the entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" when it affects the outcome of the suit under the governing law.  Id.

Moreover, a dispute of fact is not "genuine," and does not preclude the entry of summary judgment, if the evidence is

2

not sufficient to permit a jury to find in the nonmoving party's favor. <u>Id.</u>  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." <u>Matsushita Elec. Ind. Co. V. Zenith Radio</u>, 475 U.S. 574, 587 (1986)(citation omitted).

The moving party has an initial burden of informing the Court of the basis for its motion for summary judgment and of identifying the absence of a genuine issue of material fact. <u>See, e.g.</u>, <u>Chambers v. TRM Copy Centers Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994).  The Court must view all evidence presented "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." <u>Am. Cas. Co. v. Nordic Leasing, Inc.</u>, 42 F.3d 725, 728 (2d Cir. 1994) (quotations and citations omitted).

Where, as here, a motion for summary judgment is supported by affidavits or other documentary evidence, the party opposing that motion must set forth specific facts showing there is a genuine, material issue for trial. <u>See</u> <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 526 (2d Cir. 1994).

3

The object of Rule 56 "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." <u>Lujan v. Nat'l Wildlife Fed.</u>, 497 U.S. 871, 888 (1990). "An opposing party may not escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts." <u>Borthwick v. First Georgetown Secs., Inc.</u>, 892 F.2d 178, 181 (2d Cir. 1989). If the opposing party does not produce evidence which is sufficient to permit a reasonable juror to return a verdict in his or her favor on a material, factual element, then summary judgment must be granted as a matter of law. <u>See</u> <u>Burke v. Jacoby</u>, 981 F.2d 1372, 1379 (2d Cir. 1992).

<u>II. Background</u>

<u>A.</u>

Except where noted, the Court finds the following material facts undisputed. At all relevant times, defendants Marshall Holbrook and Terrance Parker were employed as police officers by the Town of Brattleboro Police Department (hereainafter the "Department"). Both Holbrook and Parker were hired pursuant to the Department's standard procedure and certified by the Vermont Criminal Justice Training Council (hereinafter "VCJTC") as full-time police officers in the State of Vermont. <u>See</u> Aff. of John Martin (appended to Paper 88 as Ex. A) at para. 18 (in 1988, Parker completed a 14-week

4

basic police training certification course; in 1994, Holbrook completed a 13-week course).

All Department officer applicants, inter alia, complete a background questionnaire which requires him or her to provide character references and background information relating to family, education, past employment, financial history, and the existence of criminal convictions.  See Martin Aff. at para. 3.  In addition, all applicants are required to possess or attain the VCJTC law enforcement certification, or, if an out-of-state applicant, a comparable certification from another source.

To begin the VCJTC certification process, one must attain a passing grade on written and physical examinations, each of which is designed to determine whether the applicant has basic proficiency skills and a minimum level of physical fitness. See Martin Aff. at paras. 4-5.  If the applicant passes both the written and physical examinations, then he or she must complete a psychological examination "designed to confirm that the applicant has positive character traits, such as honesty, good judgment, motivation, and dependability, and to ensure that he/she does not demonstrate personality traits that would make him/her unsuitable for police work."  Martin Aff. at para. 6.

If successful to this point, the applicant is interviewed by the Chief of Police and several other Department representatives.  According to Police Chief Martin, "[t]he purpose of the interview is to review and verify information supplied by the applicant to date, as well as to determine his/her interest, goals, and suitability for a position at [the Brattleboro Police Department]."  See Martin Aff. at para. 7.

The Department conducts its own background check, which includes a review of credit history, the existence of a criminal record, past employment and personal references.  The Vermont State Police Polygraph Unit, or other independent operator, conducts a polygraph examination to further uncover the existence of any information which might preclude the applicant from serving in law enforcement.  See Martin Aff. at paras. 8-9.

If one successfully passes the background check and polygraph examination, the applicant ordinarily is considered eligible for hire, contingent upon the successful completion of another physical examination, entrance to the Vermont Police Academy, and the award of VCJTC certification.  See Martin Aff. at para. 10.  Applicants who already have a full-time law enforcement certification in Vermont or another state need not attend the Vermont Police Academy, and therefore are

6

not required to pass its fitness test.  The Department, however, does require such applicants to pass an equivalent fitness test to meets its own standards.  <u>See</u> Martin Aff. at para. 11.

The Department hires successful applicants on a probationary basis for one year.  It conducts its own orientation for probationary officers.  The probationary employee is assigned for some period to work with a fully-trained Brattleboro field-training officer, who guides and evaluates performance during work assignments.  <u>See</u> Martin Aff. at para. 16.  The orientation period also includes basic instruction in Department policies and procedures, use of equipment, firearms training, and information about the Town of Brattleboro.  The orientation program is designed to prepare the officer for further field-training and the Basic Academy program at the Vermont Police Academy.  <u>See</u> Martin Aff. at para. 14.

The length of the training program at the Vermont Police Academy has varied over the years and is now a 16-week course. According to Chief Martin, the "training includes instruction in all basic areas of police work, including criminal and civil law, and provides instruction in the specific areas of mental health issues, arrest procedures and classroom and hands-on training in the use of force, including the use of

7

deadly force." Martin Aff. at para. 15. After satisfactory completion of the probationary year, the probationary employee will receive appointment as a regular, full-time officer in the Brattleboro Police Department.

The Department has established written policies and procedures which address the responsibilities of its officers. According to Chief Martin, the Department also has established a policy on the use of deadly force:

> In part, this policy provides that an officer may use deadly force to protect him/herself or others from what he/she reasonably believes to be an immediate or imminent threat of death or serious physical injury. Officers are also taught, and the policy provides, that if an officer is justified in employing deadly force, he/she shall shoot at the "center of mass," and that "the apprehension of criminal offenders and protection [sic] must at all times be subservient to the protection of life," including the life of the officer.

Martin Aff. at para. 21.

In addition, as a matter of policy, the Department adheres to the commonly-recognized "21-foot rule."

> In connection with firearms training and use of force training, [Brattleboro Police] officers are instructed in the so-called "21-foot" rule. This training alerts officers to the fact that a subject with a knife or other edged weapon who is within 21 feet of the officer is a deadly threat because the suspect can close the distance between himself and the officer before the officer can effectively react to stop the attack. In addition, through scenario based training, [Department] officers are exposed to situations in which suspects who are about to engage in deadly force frequently exhibit certain signs of aggression or pre-incident indicators of an attack such as target focus, a deep breath, a tilting of

8

the body in a forward position, a flaring of
nostrils, and other similar signs.

Martin Aff. at para. 26.  Even the plaintiffs' expert
acknowledges that a suspect who is armed with a weapon such as
a knife can quickly and fatally attack someone who is within
21 feet.  See Fyfe Dep. (appended to Paper 91 as Ex. EE) at
88-89 ("Someone who has a knife and wants to attack you can
get beyond you very quickly if you are only 8 to 15 feet away.
That's just three or four steps.  That doesn't take very long
for that to occur.  The further away you are, the better off
you are.").

The Department provides mandatory firearms training semi-
annually.  At least once a year, during the firearms
instruction, the Department's policies on the use of force are
reviewed.  See Martin Aff. at para. 22.

The Department also provides training on issues relating
to dealing with EDPs.  Officers' firearms training includes
role-playing in responding to EDPs.  In addition, on March 13,
2000, the Department conducted a mandatory training program
entitled "Suicide by Cop," which partially addressed issues
involving EDPs.  See Martin Aff. at para. 25.

In the 20 years prior to the Woodward shooting, there
were no occasions where Department officers used deadly force.
Martin Aff. at para. 27.

B.

On Sunday, December 2, 2001, at approximately 10:00 a.m,
Robert Woodward entered All Souls Church, proceeded to the
podium, and began to address the congregation.  His address
included statements concerning governmental conspiracies and
his need for sanctuary.  He appeared very agitated to members
of the congregation, none of whom knew him personally.  In
fact, two members of the congregation employed as mental
health professionals have described Mr. Woodward as being in a
psychotic state.  See Italia Dep. at 39-40; Worley Dep. at 53
(appended to Paper 91 as Exs. B and C).

Several church members asked Woodward to leave the
podium, but he refused.  The church president, Charles
Butterfield, placed a 911 call, reporting Woodward had "gone
berserk" and refused to leave the church.  See Butterfield
Dep. (appended to Paper 91 as Ex. D) at 11; accord 911 Tr.
(appended to Paper 93 as Ex. 30) at 1.

The police dispatcher, Lois Renae White, dispatched
officers to "respond to 29 South Street, the All Souls Church,
for an unwanted subject who is inside the sanctuary talking
incoherently.  Believed to have no weapons on him."  White
Dep. (appended to Paper 91 as Ex. E) at 15; 911 Tr. at 3.

Officers Terrance Parker and William Davies indicated
they would respond to the dispatch.  Officer Marshall Holbrook

10

also proceeded to the church.   While these responding officers
were en route, White advised: "Subject is indicating he's
upset with the police, that he's been threatened by them, so,
just so you're aware," and then "Apparently, he's now making
threats toward the congregation.   There are 60-70 in the
building."   White Dep. at 18 and 24; 911 Tr. at 5.

As the situation at the church progressed, White relayed:
"[S]ubject is threatening his own self now, and they're saying
he does have a knife."   White Dep. at 27; 911 Tr. at 6.   At
the scene, Woodward had become upset when parishioners began
to leave the room, and he took out a knife having an
approximately 3.5-inch blade and held it to his right eye and
temple.

The first officer to arrive at All Souls Church was
Holbrook.   A gentleman told Holbrook that Woodward was in the
church, had a knife, and had been threatening people.   See
Holbrook Dep. (appended to Paper 91 as Ex. F) at 71.   When
Officers Parker and Davies arrived, Holbrook told them
Woodward had a knife and was located in the front of the
church, refusing to come out.   See Holbrook Dep. at 70; Davies
Dep. (appended to Paper 91 as Ex. G) at 46.

Upon entering the church sanctuary, the officers observed
Woodward moving about in a relatively confined area and
exhibiting emotional disturbance.   Witnesses placed an

AO 72A
(Rev.8/82)

agitated Woodward in the front of the church, between a
Christmas tree and the podium.  See, e.g., Chaillou Dep.
(appended to Paper 91 as Ex. R) at 18; Worth Dep. (appended to
Paper 91 as Ex. J) at 27.  The officers decided to position
themselves between Woodward and the congregation, as quickly
as possible, to secure its safety.  See Holbrook Dep. at 87.
Parker and Davies positioned themselves in the center aisle,
with Parker to the front of the room and Davies remaining in
the back.  Holbrook took a place at the front of the room, but
off to the left.

Initially, Officer Parker was 20-25 feet from Mr.
Woodward.  See Parker Dep. at 142.  Parker approached Woodward
while instructing the congregants to leave the room.  He also
asked Woodward, several times, to put down his knife.  See,
e.g., Davies Dep. at 55-56; Worth Dep. at 28.  Woodward
refused to drop the weapon.

Woodward seemed to focus on, and then move towards,
Officer Parker.  See Holbrook Dep. at 111-12; Parker Dep. at
140, 150; see also Payne Dep. (appended to Paper 91 as Ex. S)
at 25 (describing Woodward before the shooting: "He had his
attention only on them [the officers]."), and at 26 ("I recall
that he switched the knife from one hand to the other and
back, and gave a motion of advance to [the police]."); Manning
Dep. (appended to Paper 91 as Ex. P) at 35 ("There was a

12

forward movement on Robert Woodward's part.")  At his
deposition, Parker testified he believed he was in imminent
danger because Woodward took a deep breath, made a grunting
noise, and moved toward him with the knife pointed in his
direction.  <u>See</u> Parker Dep. at 140, 145; <u>see</u> <u>also</u> Payne Dep.
at 28 (After the shooting, Woodward fell to the floor
approximately "four or five feet" from the nearest officer).
This testimony is corroborated by congregants who were able to
see Woodward's interaction with the officers.  <u>See</u> Worley Dep.
at 36 ("But I remember him being - being close back to the
tree at the time when they first came out, and then he started
to progress forward."); Payne Dep. at 27 (indicating the knife
was pointed "toward the officers" and that Woodward "never
retreated"); Manning Dep. (appended to Paper 91 as Ex. P) at
35 ("Robert Woodward moved forward, did some movement with the
knife.").

    In response, the plaintiffs suggest Woodward did not act
in a manner which police could reasonably construe as
threatening.  <u>See</u> Plaintiffs' Response (Paper 93) at para. 4
(listing several witnesses who saw Woodward point the knife
towards his own eye and did not see him threaten or advance).
An examination of the deposition testimony of congregants upon
whose statements the plaintiffs rely to raise a disputed
factual issue, however, suggests these individuals were unable

13

to see Mr. Woodward's actions immediately prior to the shooting.  See Hunt Dep. (appended to Paper 97 as Ex. O-1) at 38 (He did not recall what Woodward was doing just before the first shot because at that point his attention was "glued" on officers.); Ames Dep. (appended to Paper 97 as Ex. M-1) at 33 (He could not see Woodward very well when the police arrived.); Wilson Dep. (appended to Paper 97 as Ex. N-1) at 46 (Prior to the shooting she "was not looking directly into his eyes."); Hunt Dep. (appended to Paper 97 as Ex. FF-1) at 39 ("Nobody could tell everything that was happening.  It was happening too fast.").

Officer Davies also saw Woodward lower his knife and move forward rapidly toward Parker.  See Davies Dep. at 61-62.  Woodward was between five and fifteen feet from Parker, and approximately seven feet from parishioner Jane Worley.  See, e.g., Worley Dep. at 40-41 and 54; Chaillou Dep. at 22-23.

Officers Parker and Holbrook fired seven shots in rapid succession.  See Parker Dep. at 147.  According to Officer Davies, "Officer Parker fired first then Holbrook had his weapon out and then this was when Mr. Woodward lunged at Officer Parker, after the first shots, that it was almost, like, simultaneously when Officer Holbrook and Officer Parker fired again."  Davies Dep. at 69.

AO 72A
(Rev.8/82)

Officer Davies did not draw his weapon.  When Holbrook shot, he judged Woodward to be within six feet of Officer Parker and believed he could harm Parker.  <u>See</u> Holbrook Dep. at 92, 107.  By the time the last shot was fired, Woodward was approximately two feet from Officer Parker.  <u>See</u> Parker Dep. at 150-51.

After the last shot, Woodward fell in front of and to the left of the podium.  He continued to hold the knife after he fell.  Officer Holbrook confiscated the knife, and Woodward was handcuffed.  <u>See generally</u> Holbrook Dep. at 122-23. According to several witnesses, Woodward apologized to the officers and indicated he wanted them to shoot him.  <u>See</u>, <u>e.g.</u>, Mayo Dep. (appended to Paper 91 as Ex. W) at 12 (Woodward apologized several times); Hammond Dep. (appended to Paper 91 as Ex. X) at 11-12 (same); Faulkner Dep. (appended to Paper 91 as Ex. Y) at 13-14 ("While we were in the care [sic], . . . he seemed to calm, become what I feel to be rational, and direct[ed] a statement to me, stating, 'Please tell the officer that I did not want to hurt him. . . .  I just wanted him to shoot me.'").  Mr. Woodward was taken to the hospital and died during surgery.

### III. Discussion

#### A. Brattleboro's Motion for Summary Judgment

The plaintiffs state their federal claim against the Town of Brattleboro as follows: "The Town is liable to the plaintiffs for violations of the <u>Monell</u> standard, cognizable under 42 U.S.C. § 1983, for insufficient training of the individual defendants due to their [sic] ignorance of training officers to deal with emotionally disturbed persons (EDPs). . . ." Plaintiffs' Consolidated Memorandum (Paper 94) at 7. They argue Brattleboro "has no official or written training program with respect to dealing with EDPs despite the fact that they must be treated in a fashion different from common criminals and it is recognized that the officers will come in contact with EDPs on a regular basis." Paper 94 at 14.

In <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978), the Supreme Court held "[l]ocal governing bodies. . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." "Conversely, constitutional torts committed by city employees without official sanction or authority do not typically

16

implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." Amnesty Am. v. Waugh, 361 F.3d 113, 125 (2d Cir. 2004).

"[W]hen a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." Id. at 126. Thus, the Town of Brattleboro cannot be held liable under a theory of respondeat superior, or merely by virtue of its status as the individual defendants' employer. See, e.g., Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997).

The plaintiffs claim the Town failed to train its police officers to effectively confront EDPs like Mr. Woodward. In City of Canton v. Harris, 489 U.S. 378 (1989), the Supreme Court outlined when an alleged "failure to train" can provide a basis for imposing municipal liability. The Court held: "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." Id. at 388.

17

Suggesting that officers could have handled a single situation more effectively given different or more extensive training is insufficient.

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that any injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situation with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Id. at 390-91 (citations omitted).

Given this standard, the plaintiffs clearly have not met their burden of demonstrating the Town may be held liable for the tragic shooting at issue. They have failed to assail the adequacy of the Town's policies with respect to hiring, supervising, and training its officers for the type of citizen encounters they routinely face. Specifically, the defendants have demonstrated the Town of Brattleboro has a policy on and conducts training concerning the use of deadly

18

force, and that the individual defendants received training on that policy.

In addition, the officers received training on the topic of dealing with EDPs. The fact that the plaintiffs present an expert who generally questions the efficacy of that training does not preclude summary judgment. See, e.g., Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)("the simple recitation that there was a failure to train municipal employees does not suffice. . .").

Moreover, the plaintiffs do not identify any other similar, fatal shooting involving a Brattleboro police officer. See Bryan County v. Brown, 520 U.S. at 407-08 ("a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training . . ." caused the injury); Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992) (Plaintiff must show, inter alia, "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."). In short, the record discloses no evidence of municipal misconduct or deliberate indifference which would rise to the level of a constitutional violation, nor have the plaintiffs demonstrated the necessary causative link between the

19

Department's policies or practices and the shooting of Mr. Woodward.  The Town of Brattleboro's Motion for Summary Judgment is GRANTED as to plaintiffs' claims under 42 U.S.C. § 1983.

### B. Officers' Motion for Summary Judgment

The plaintiffs also claim Officers Holbrook and Parker are liable under federal law "for using excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983, by shooting Mr. Woodward dead when he threatened no one but himself."  Paper 94 at 7.  Holbrook and Parker maintain the force they used was reasonable, and they are entitled to qualified immunity from the plaintiffs' suit.

The Fourth Amendment provides the standard for considering plaintiffs' claim that the individual defendants used excessive force.  See Graham v. Connor, 490 U.S. 386, 394 (1989).  The Supreme Court has instructed that, to resolve an excessive force claim, a court must conduct a two-part analysis: "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; [and] second, assuming the violation is established, the question whether the right was clearly established must be considered. . . ."  Saucier v. Katz, 533 U.S. 194, 200 (2001).

20

### 1. Existence of a Constitutional Violation

Where, as here, a court is required to rule on a claim of qualified immunity, it must address this "threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id.

Generally, the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Id. at 202. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 397. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to underlying intent or motivation." Id.

"It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the

21

officer or others." O'Bert v. Vargo, 331 F.3d 29, 36 (2d
Cir. 2003). "The reasonableness inquiry depends only upon
the officer's knowledge of circumstances immediately prior to
and at the moment he made the split-second decision to employ
deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d Cir.
1996).

Here, immediately prior to the officers' arrival at All
Souls Church, the 911 dispatcher informed them that Mr.
Woodward had a knife, was emotionally charged, and was
threatening the congregation. They were entering a situation
where a number of congregants were in close proximity to a
potentially dangerous man.

Upon entering the church, the officers could see
Woodward indeed had a weapon and, as informed by the "21-
foot" rule, in a position where he could do serious harm to a
number of individuals, including the officers themselves.
Woodward refused to put the weapon down, a circumstance
which, when coupled with Woodward's agitated demeanor and
unpredictable behavior, could lead a reasonable officer to
conclude that someone could be hurt if Woodward was not
immediately subdued. In the heat of the moment, the officers
determined that Woodward made a potentially threatening
movement which caused Parker to fear for his own safety and
the safety of others in the vicinity.

22

The plaintiffs have attempted to create a material factual dispute on the specific issue of whether, immediately prior to the shooting, Woodward pointed the knife at Parker and lunged at him.  The plaintiffs have identified several congregants who judged Woodward's actions as only indicating an intent to harm himself; the defendants have identified other witnesses who support the officers' view that Woodward's actions suggested an imminent threat to Parker or others.  This apparent discrepancy, involving nuanced interpretations of the admittedly emotionally disturbed man's rapid and unpredictable actions and motivations, does not preclude the entry of summary judgment in this case.

In this context, "we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).  Thus, the plaintiffs' disputed facts, which speculate on Woodward's subjective motivations and question whether the police officers could have handled an EDP like Mr. Woodward differently, are not material; the issue is whether the defendants, given what they knew at the time of the incident, objectively acted reasonably, not whether, as a matter of factual hindsight, they could have made a better decision or

23

ultimately made the correct decision.  See, e.g., Wood v. City of Lakeland, 203 F.3d 1288, 1292 (11th Cir. 2000)(Despite plaintiff's assertion that the decedent posed no immediate threat and only intended to injure himself with a knife, the shooting officer was entitled to qualified immunity unless a fact finder could find that "no reasonable person in the defendant's position could have thought the facts" indicated the decedent posed a threat.); Reynolds v. County of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996)(In a case where police fatally shot a knife-wielding man, "[t]he fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable."), overruled on other grounds, Acri v. Varian Assoc., Inc. 114 F.3d 999 (9th Cir. 1997).

The facts, as related by the dispatcher or known by the officers, were that Woodward (1) was armed with a knife, (2) had refused to put down the weapon, (3) had threatened members of the congregation, (4) was acting irrationally, (5) was in close proximity to several individuals, and (6) was continuing to move back and forth.  Under these circumstances, it was reasonable for the officers to approach Woodward, to confine him, and to disarm him.  Given the split-second judgment which the defendants had to make, the Court is unable to find the officers' conduct objectively

24

unreasonable and therefore violated Mr. Woodward's constitutional rights.

### 2. Clearly-Established Right

Assuming the plaintiffs have alleged the violation of Mr. Woodward's constitutional rights under the Fourth Amendment, the Court must afford the defendants qualified immunity if the constitutional right was not clearly established at the time of the violation. "This inquiry focuses on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Cowan v. Breen, 352 F.3d 756, 761 (2d Cir. 2003)(citation and quotations omitted).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier, 533 U.S. at 205.

Recently, in O'Bert v. Vargo, 331 F.3d at 36, the Second Circuit addressed the nature of a court's review in a case involving not merely excessive, but deadly force:

25

> A government official sued in his individual
> capacity is entitled to qualified immunity (1) if
> the conduct attributed to him is not prohibited by
> federal law . . .; or (2) where that conduct is so
> prohibited, if the plaintiff's right not to be
> subjected to such conduct by the defendant was not
> clearly established at the time of the conduct
> . . . ; or (3) if the defendant's action was
> objectively legally reasonable in light of the
> legal rules that were clearly established at the
> time it was taken. . . . In a case involving the
> use of deadly force, only the objective
> reasonableness branch of this test presents any
> possibility for a qualified immunity defense.

Id. at 36 (citations and quotations omitted).

Accordingly, if the Court determines that Officers

Holbrook and Parker's actions, viewed objectively and in a

light most favorable to the plaintiff, were reasonable, then

they are entitled to qualified immunity. See, e.g., Malley

v. Briggs, 475 U.S. 335, 341 (1986)("all but the plainly

incompetent or those who knowingly violate the law" are

protected by qualified immunity).

For the reasons discussed supra, Officers Holbrook and

Parker's actions were objectively reasonable, and they are

entitled to qualified immunity. See Saucier, 533 U.S. at 214

(Justice Ginsburg, concurring)(Questioning the utility of the

majority's two-part analysis, Justice Ginsburg notes "an

officer who uses force that is objectively reasonable in

light of the facts and circumstances confronting [him] . . .

simultaneously meets the standard for qualified immunity . .

. and the standard the Court set forth in Graham for a

26

decision on the merits in his favor.")(citations omitted).
"If an officer reasonably, but mistakenly, believed that a
suspect was likely to fight back, for instance, the officer
would be justified in using more force than in fact was
needed." Saucier, 533 U.S. at 205.

Here, the Court is unable to conclude that the officers'
use of deadly force was objectively unreasonable.  Given the
undisputed fact that Mr. Woodward was armed and
uncooperative, it was objectively reasonable for officers to
believe that either their lives or the lives of others in the
area were in danger.  See Cowan, 352 F.3d at 764; see also
Stephenson v. Doe, 332 F.3d 68, 80 n.15 (2d Cir.
2003)(Qualified immunity "looks to the reasonableness of an
officer's belief that he acted lawfully after the officer is
found to have been unreasonable in his conduct.").  The
individual defendants' Motion for Summary Judgment on
plaintiffs' federal claims is GRANTED.

## C. State Law Claims

The plaintiffs also purport to state claims against the
defendants under Vermont law.  See Paper 83 at Count Three
(negligent discharge of firearms) and Count Four (negligent
training and supervision; vicarious liability); see also
Paper 94 at 7 n.3 (plaintiffs withdraw all substantive due
process claims).  To the extent that the plaintiffs have

27

brought state law claims in addition to claims pursuant to 42 U.S.C. § 1983, those claims are likewise subject to immunity defenses under Vermont law.

"In Vermont, as in most jurisdictions, municipalities can only be held liable for injuries arising from their proprietary, as opposed to governmental, duties." Decker v. Fish, 126 F. Supp. 2d 342, 346 (D. Vt. 2000).  In this regard, "there can be little question that police work is a quintessential governmental function." Id.  The Town of Brattleboro and its police department are immune from plaintiffs' state law claims.

Furthermore, as municipal officers, Holbrook and Parker are entitled to qualified immunity from plaintiffs' state law claims.  See, e.g., Hudson v. Town of E. Montpelier, 161 Vt. 168, 171 (1993).  Under Vermont law, "[q]ualified immunity is a judicially created doctrine that shelters state and municipal officials from suits for acts performed in the course of their duties." Morais v. Yee, 162 Vt. 366, 373 (1994).  Qualified immunity protects municipal employees when they are "(1) acting during their employment and acting, or reasonably believing they are acting, withing the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts." LaShay v. Dep't of Soc. and Rehab. Servs., 160 Vt. 60, 65 (1993).

In this case, it is beyond dispute that the defendant officers were acting within the scope and authority of their employment and performing discretionary functions. Furthermore, as discussed <u>supra</u>, for the purpose of determining entitlement to immunity from suit, their actions were objectively reasonable.  Lastly, the record provides no indication of bad faith or malice which would support a finding that the officers did not act in "good faith" as that term is defined under Vermont law.  The individual defendants, therefore, are entitled to qualified immunity under state law.

### IV. Conclusion

The Motions for Summary Judgment filed by defendant Town of Brattleboro (Paper 86) and the individual defendants (Paper 89) are GRANTED.

SO ORDERED.

Dated at Brattleboro, Vermont, this *1ST* day of July, 2004.

J. Garvan Murtha
United States District Judge

29