```
                 UNITED STATES DISTRICT COURT
                     DISTRICT OF VERMONT


JOANNE WOODWARD, ADMINISTRATRIX    :
OF THE ESTATE OF ROBERT WOODWARD,  :
PAUL WOODWARD, JOANNE WOODWARD,    :
and JILL WOODWARD DEBRADY,         :
          Plaintiffs               :
                                   :    CIVIL NO. 1:02CV35
     v.                            :
                                   :
TOWN OF BRATTLEBORO,               :
MARSHALL HOLBROOK,                 :
and TERRANCE PARKER,               :
          Defendants               :
_____:
```

## RECONSIDERATION OF SUMMARY JUDGMENT AND RULING ON REMAND

### I. Background

This matter has been the subject of several rulings, familiarity with which is presumed.  See Woodward v. Town of Brattleboro, Summary Order (2d Cir. Aug. 23, 2005); Ruling on Defendants' Motions for Summary Judgment (D. Vt. July 1, 2004) (hereinafter "Summary Judgment Ruling").

After studied consideration of the extensive record submitted by the parties, on July 1, 2004, this Court granted motions for summary judgment filed by the Town of Brattleboro and individual defendants Marshall Holbrook and Terrance Parker.  The Court found, inter alia, that defendants Holbrook and Parker did not violate Mr. Woodward's civil rights, or in the alternative, are entitled to qualified immunity from suit.

1

Upon consideration of plaintiffs' appeal, the Second Circuit focused on the affidavits of several witnesses and noted:

> Here, four witnesses gave sworn statements that Woodward made no advances or threatening moves toward the Officers or any bystanders before he was shot.  The district court discounted these witnesses' accounts for unconvincing reasons.  Specifically, Ames stated he could not see Woodward very well when the Officers arrived.  But when the Officers arrived, Woodward was behind the podium, where of course Ames's view would be obstructed; when he was shot, Woodward was out in the open.  Norman Hunt stated that before the first shot, his attention was glued on the officers.  A rational fact finder could infer that the fact that Norman Hunt's concentration was not broken by an attack indicates that there was no attack, or that Hunt's concentration would naturally have shifted after the first shot.  Mary Hunt stated that things happened too fast for anyone to tell everything that happened.  Nonetheless, one of the things that she did observe, and swore to, was that Woodward did not advance on the Officers.  Wilson stated that prior to the shooting, she was not looking directly into Woodward's eyes.  There is a great difference between making eye contact with a person and being able to observe whether that person moves forward twenty feet.  Furthermore, plaintiffs demonstrate that some witnesses who claim to have seen Woodward advance on the officers gave conflicting statements at the time of the shooting.
>
> The district court may thus have been improvident to discount these witness statements.

Summary Order at 2-3.  Accordingly, as to the individual police officers, the Second Circuit vacated and remanded this matter "for consideration of the summary judgment motion both on the merits and qualified immunity, including proper consideration of the testimony and affidavits of Ames, the Hunts, and Wilson."  Summary Order at 3.

As an initial observation, the Court notes it did not "discount" the affidavits of Ames, the Hunts and Wilson; it fully considered their content and materiality to the issues pending resolution.  See, e.g., Summary Judgment Ruling at 13-14 (suggesting these witnesses may not have been able to see Woodward's allegedly "threatening" looks or actions prior to the shooting).  Rather, this Court found the discrepancies their statements raise are not material under the applicable legal standard.

On the undisputed record, this Court's Summary Judgment Ruling explained:

> Here, immediately prior to the officers' arrival at All Souls Church, the 911 dispatcher informed them that Mr. Woodward had a knife, was emotionally charged, and was threatening the congregation.  They were entering a situation where a number of congregants were in close proximity to a potentially dangerous man.
>
> Upon entering the church, the officers could see Woodward indeed had a weapon and, as informed by the "21-foot" rule, in a position where he could do serious harm to a number of individuals, including the officers themselves.  Woodward refused to put the weapon down, a circumstance which, when coupled with Woodward's agitated demeanor and unpredictable behavior, could lead a reasonable officer to conclude that someone could be hurt if Woodward was not immediately subdued.  In the heat of the moment, the officers determined that Woodward made a potentially threatening movement which caused Parker to fear for his own safety and the safety of others in the vicinity.
>
> The plaintiffs have attempted to create a material factual dispute on the specific issue of whether, immediately prior to the shooting, Woodward pointed the knife at Parker and lunged at him.  The plaintiffs have identified several congregants who judged Woodward's

>    actions as only indicating an intent to harm himself;
>    the defendants have identified other witnesses who
>    support the officers' view that Woodward's actions
>    suggested an immediate threat to Parker or others.
>    This apparent discrepancy, involving nuanced
>    interpretations of the admittedly emotionally disturbed
>    man's rapid and unpredictable actions and motivations,
>    does not preclude the entry of summary judgment in this
>    case.
>
>        In this context, "we are not concerned with the
>    correctness of the defendants' conduct, but rather the
>    'objective reasonableness' of their chosen course of
>    action given the circumstances confronting them at the
>    scene." Lennon v. Miller, 66 F.3d 416, 421 (2d Cir.
>    1995). Thus, the plaintiffs' disputed facts, which
>    speculate on Woodward's subjective motivations and
>    question whether the police officers could have handled
>    an EDP like Mr. Woodward differently, are not material;
>    this issue is whether the defendants, given what they
>    knew at the time of the incident, objectively acted
>    reasonably, not whether, as a matter of factual
>    hindsight, they could have made a better decision or
>    ultimately made the correct decision.

Summary Judgment Ruling at 22-24.

On remand, the parties have furnished the Court with Supplemental Affidavits from Adelbert Ames and Polly Wilson. The Court has fully examined these submissions, as well as other transcripts and portions of the record which the parties have highlighted as relevant to this Court's review of its Summary Judgment Ruling on remand. On their face, these additional submissions provide no new material details which alter the Court's decision on the defendants' entitlement to immunity from suit.

Both Ames and Wilson assert they were watching Mr. Woodward closely, and they did not observe him make any threatening

4

gestures or movements prior to the shooting.  Mr. Ames specifically states: "I did not fear for my own safety nor for the safety of the other members of the congregation throughout the time Robert Woodward was present."  Supplemental Affidavit of Adelbert Ames (Paper 107) at ¶ 4.  Ms. Wilson maintains: "I did not observe him at any time lower the knife from his eye, charge, lunge or make any advances, movements or threatening gestures toward any of the officers or persons present in the church."  Supplemental Affidavit of Polly Wilson (Paper 108) at ¶ 2.

Also relevant, in the transcript of her more extensive statement to the Vermont State Police, attached to her Supplemental Affidavit, Ms. Wilson states that, like Mr. Ames, she was "not in the slightest disturbed by this man" although she admits Woodward was "very very paranoid and upset."  Paper 108, Ex. A, at 4.  While explaining to police that Woodward "never threatened anyone else with the knife," Ms. Wilson also reiterates the otherwise undisputed observation that "when you have somebody whose [sic] not, in my opinion, in charge of himself and he has a weapon, it's not only scary for himself but it's scary for other people and I quite understand why people were, you know, we live in a society these days where fear is a major factor."  Paper 108, Ex. A, at 5-6.

In addition, prior to remand, affiants Norman and Mary Hunt tendered similar testimony.  Both echoed that they personally did

not fear for their own safety or the safety of the other members of the congregation, and that they "did not hear Robert Woodward make any growling or grunting sounds" or "observe him flaring his nostrils, take a deep breath, or stare at the officers immediately before the shooting." Affidavits of Norman Hunt and Mary Hunt (appended to Paper 109) at ¶¶ 3-4.

## II. Standard of Review

A court's role when considering a motion for summary judgment is "to determine as a threshold matter whether there are genuine unresolved issues of <u>material</u> fact to be tried." <u>Gibson v. Am. Broad. Co.</u>, 892 F.2d 1128, 1132 (2d Cir. 1989) (emphasis added). Only disputes over material facts which might affect the outcome of the suit under the governing law preclude the entry of summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A fact is "material" when it affects the outcome of the suit under the governing law. <u>Id.</u> Moreover, a dispute of fact is not "genuine," and does not preclude the entry of summary judgment, if the evidence is not sufficient to permit a jury to find in the nonmoving party's favor. <u>Id.</u> "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> at 252. "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no 'genuine issue for trial'." Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)(citation omitted).

The moving party has an initial burden of informing the Court of the basis for its motion for summary judgment and of identifying the absence of a genuine issue of material fact. See, e.g., Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994). The Court must view all evidence presented "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994) (quotations and citations omitted).

Where, as here, a motion for summary judgment is supported by affidavits or other documentary evidence, the party opposing that motion must set forth specific facts showing there is a genuine, material issue for trial. See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

The object of Rule 56 "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). "An opposing party may not escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts." Borthwick v. First Georgetown Secs., Inc., 892 F.2d 178, 181 (2d Cir. 1989). If the

opposing party does not produce evidence which is sufficient to permit a reasonable juror to return a verdict in his or her favor on a material, factual element, then summary judgment must be granted as a matter of law.  See Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992).

### III. Discussion

Unquestionably, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  Tennessee v. Garner, 471 U.S. 1, 7 (1985).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. 386, 396 (1989).

According to the Supreme Court, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged."  Saucier v. Katz, 533 U.S. 194, 200 (2001). "[I]f the analysis focuses on whether an officer made a reasonable mistake of fact that justified his conduct, what is being examined is whether there was a constitutional violation, not whether the officer is entitled to qualified immunity." Cowan v. Breen, 352 F.3d 756, 762 (2d Cir. 2003).  Thus, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed" and no

violation of a constitutional right has occurred.  <u>Saucier</u>, 533 U.S. at 205.

Second, assuming the violation of a constitutional right, the Court must consider whether the officers are nevertheless entitled to qualified immunity.  <u>Id.</u> at 202.  Specifically, "[e]xcessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."  <u>Id.</u> at 206.

> The qualified immunity inquiry, on the other hand, has a further dimension.  The concern of the immunity is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

<u>Id.</u>

The Court's examination of the now supplemented record in light of this standard once again indicates that, in this undeniably tragic circumstance, either no constitutional violation occurred or, in the alternative, the defendants are entitled to qualified immunity.  When considering whether a constitutional right was violated, "[t]he reasonableness of the officer's decision depends only upon the officer's knowledge of

9

the circumstances immediately prior to and at the moment he made the split-second decision to employ deadly force." Cowan, 352 F.3d at 762 (citation and quotations omitted).

It is undisputed that Woodward was armed with a knife which he refused to relinquish. He was acting irrationally. He had displayed the weapon within close proximity to several individuals and, at the time of the shooting, was within 21 feet of the officer or others in the room. Prior to their arrival on the scene, a police dispatcher had explicitly informed the defendants that Mr. Woodward was incoherent and upset with the police.

As explained by the Supreme Court in Tennessee v. Garner, the presence of a dangerous weapon in a situation where either officer or bystanders could be injured is an important factor when determining whether the use of deadly force was reasonable:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than they escape.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . . Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious physical harm, deadly force may be used if

>   necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11-12.

Moreover, witness statements which speculate on Woodward's personal intent to only harm himself, while relevant and fully considered by this Court, are not dispositive.  When viewed in light of his refusal to release his weapon, any potential movement by Woodward, whether or not some witnesses considered such movement innocuous, could reasonably be viewed as requiring the use of deadly force.  See Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998) ("Notwithstanding the possibility of a dispute about whether a knife was actually in Sigman's hand at the moment of the shooting, Officer Riddle, and the other officers present, acted on the perception that Sigman had a knife in his hand" and therefore are entitled to qualified immunity.).

In both O'Bert v. Vargo, 331 F.3d 29 (2d Cir. 2003), and Cowan v. Breen, 352 F.3d at 756, the Second Circuit affirmed the trial courts' denials of summary judgment, finding inter alia, that disputed factual issues precluded finding the defendant-officers' reasonably used deadly force.  Those cases, however, are distinguishable from this case.

In O'Bert, for example, the court extensively examined the record and found disputed facts relating to the threshold circumstances confronting the officer after he entered the

11

decedent's home.  331 F.3d at 32.  After such examination, the Second Circuit concluded:

> In sum, although [Officer] Vargo's appeal is purportedly premised on his acceptance of plaintiff's version of the facts and all permissible inferences that could be drawn in plaintiff's favor, that version and those inferences do not entitle Vargo to judgment as a matter of law.  On plaintiff's version of the facts, in which Vargo shot to kill O'Bert while knowing that O'Bert was unarmed, it is obvious that no reasonable officer would have believed that the use of deadly force was necessary.

Id. at 40.

Similarly, in Cowan, the court considered whether a police officer used excessive force when he fired a fatal shot at the driver of an automobile.  Finding disputed the threshold fact of whether "the Camaro was bearing down on [the officer] as he waved his hands, signaling Cooper to stop," the Second Circuit affirmed the trial court's denial of summary judgment.  352 F.3d at 761.  As in O'Bert, the Cowan court explained:

> Although Breen's appeal is purportedly based on the undisputed facts in the case, accepting Cowan's version of the facts reveals that Breen is not entitled to judgment as a matter of law on the first issue of whether a constitutional violation occurred.  Indeed, it is clear that determination of that issue turns on which of two conflicting stories best captured what happened on the street, . . . making summary judgment inappropriate.

Id. at 764.

The undisputed facts in this case raise no such material dispute; select witness statements which suggest no threatening movements by Mr. Woodward, even if taken as true, do not raise a

12

material factual dispute as to the reasonableness of the officers' actions when those statements are viewed in light of the remaining, undisputed factual circumstances the officers confronted.  Unlike O'Bert, no one in this case claims Mr. Woodward was unarmed.  Unlike Cowan, no one claims Woodward was isolated or not in a position to harm either the officers or others nearby.  The testimony of Ames, Wilson and the Hunts that Woodward made no threatening moves does not raise a material issue of disputed fact where remaining undisputed facts support a reasonable conclusion that (1) Woodward was armed and reported to be agitated or psychotic; (2) he disobeyed orders to drop his weapon; and (3) he was in a position to, suddenly and without warning, injure another person in his proximity.

    The plaintiffs have additionally tendered expert testimony through which they suggest the defendant officers acted unprofessionally by, inter alia, "walk[ing] within approximately 8 to 15 feet of Mr. Woodward," thereby putting themselves in harm's way and escalating the situation.  See Report of James Fyfe (appended as exhibit to Paper 109) at 4.  That opinion likewise does not raise a material issue of fact.  As the Second Circuit has explicitly instructed:  An officer's "actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force. The reasonableness inquiry depends only upon the officer's

knowledge of circumstances immediately prior to and at the moment he made the split-second decision to employ deadly force." <u>Salim v. Proulx</u>, 93 F.3d 86, 92 (2d Cir. 1996).

Here, the "21-foot" rule is relevant in that, as a matter of training and policy, it informs officers of the circumstances under which they must assume that a person, such as Mr. Woodward, is able to unexpectedly and quickly do serious harm to those within that area.  <u>See</u> Summary Judgment Ruling at 22.  The fact that Mr. Woodward had a knife, was within 21 feet of people, and refused to relinquish the weapon, presented a situation which, according to police training, could potentially and unexpectedly have turned fatal for an officer or other bystanders.  No matter how "benign" some witnesses found Mr. Woodward to be at the moment immediately before the shooting, a properly trained officer in these circumstances could reasonably determine the use of force was legal and necessary to diffuse the situation.  <u>See</u> <u>Loria v. Gorman</u>, 306 F.3d 1271, 1282 (2d Cir. 2002) ("Although there was indeed a factual dispute on the issue, it was not material and therefore cannot preclude a grant of summary judgment.").

In fact, implicit in the 21-foot rule is the recognition that, had Mr. Woodward unexpectedly lunged at someone, this Court could have been considering a different set of plaintiffs who would claim police failed to control him in a timely manner.  <u>Cf.</u>

Tennessee v. Garner, 471 U.S. at 19 ("Actual departmental policies are important [and] We would hesitate to declare a police practice of long standing 'unreasonable' if doing so would severely hamper effective law enforcement."). This reality highlights the inherent ambiguity in such situations and supports a finding that, in this particular case, the defendants acted with objective reasonableness and that no constitutional violation occurred. See Sigman, 161 F.3d 788 ("As the basis for [the 21-foot] rule, the department identified studies which have shown that an assailant with an edged weapon within 21 feet of an armed police officer can kill the officer before the officer can get off a disabling shot.").

This 21-foot rule is also relevant on the second inquiry, that is, whether a reasonable officer would have concluded that his conduct was lawful in the situation he confronted. See, e.g., Cowan, 352 F.3d at 761. By virtue of their training, the defendants could reasonably have believed Mr. Woodward's proximity represented an immediate danger which they could legally address with deadly force, and thereby they are entitled to qualified immunity.

In this regard, Wilson v. Meeks, 52 F.3d 1547 (10th Cir. 1995) is instructive. In Wilson v. Meeks, the estate of an individual shot by the police filed a civil rights claim alleging the officers used excessive force. The plaintiffs argued, inter

15

alia, that witnesses and expert testimony indicated the deceased was actually holding his gun in a "surrender position," and therefore the police shooting was not the result of a reasonable determination that the subject posed an immediate threat to the safety of the officer or others.  Id. at 1553.  Rejecting the argument, the court explained:

> Mr. Wilson's hand, by all accounts, was not pointed far enough to the right to dispute Officer Meeks' contention that he reasonably feared for his life.  Indeed, it is hard to imagine that pointing a.357 magnum in any direction would not cause a reasonable police officer to fear for someone's life–if not his own, then the life of a bystander or the gunman himself.
>
> Plaintiffs have erroneously cast this factual dispute as an inquiry into whether Mr. Wilson was surrendering.  They point out that he had backed up as Officer Meeks directed, and that he was "quivering" and not holding his gun horizontal and perpendicular to the ground.  Perhaps Mr. Wilson intended to surrender.  If so, his death is particularly tragic.  However, the inquiry here is not into Mr. Wilson's state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, Officer Meeks reasonably feared for his life.  Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant.  It requires that he react reasonably to a threat.  Officer Meeks did so.

Id. at 1553-54.

The analogy is clear.  Mr. Woodward may have, in fact, not intended harm to anyone in the room.  Nevertheless, the onus is not on the police to discern that intent.  They must deal with the objective facts before them.  Prior to the shooting, Mr. Woodward had been incoherent and anxious, uncooperative and

16

armed, and within a zone where he could inflict damage on someone, as addressed in the "21-foot" directive.  Under these circumstances, the defendants are entitled to qualified immunity.  See Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992) ("Plaintiffs may not unwrap a public officer's cloak of immunity from suit simply by alleging even meritorious factual disputes relating to probable cause, when those controversies are nevertheless not material to the ultimate resolution of the immunity issue.").

## IV. Conclusion

The outcome of this standoff is an undeniable tragedy for plaintiffs and defendants alike.  Nevertheless, a tragic outcome does not, in and of itself, require the conclusion that the defendants violated Mr. Woodward's rights.  Upon reconsideration, the Court's Summary Judgment Ruling (Paper 100) granting defendants' motions for summary judgment (Papers 86, 89) is AFFIRMED.

SO ORDERED.

Dated at Brattleboro, Vermont, this 5th day of January, 2006.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge